## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Ricardo Cruz, | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 1966 C.D. 2015 |
| | : | Submitted: April 29, 2016 |
| Workers' Compensation Appeal | : | |
| Board (A.J. Bazzini Co., Inc.), | : | |
| Respondent | : | |

BEFORE: HONORABLE P. KEVIN BROBSON, Judge
HONORABLE MICHAEL H. WOJCIK, Judge
HONORABLE JAMES GARDNER COLINS, Senior Judge

*OPINION NOT REPORTED*

**MEMORANDUM OPINION**
**BY JUDGE BROBSON**                    **FILED: August 22, 2016**

Petitioner Ricardo Cruz (Claimant) petitions for review of an order of the Workers' Compensation Appeal Board (Board). The Board affirmed a decision of a Workers' Compensation Judge (WCJ), granting the termination petition filed by Claimant's employer, A.J. Bazzini Co., Inc. (Employer). For the reasons set forth herein, we affirm the Board's order.

Claimant worked for Employer as a forklift operator. On February 14, 2011, Claimant sustained a work-related injury in the nature of a crushing injury to his right and left lower limbs. Employer accepted liability for Claimant's work-related injury pursuant to an Amended Notice of Compensation Payable. On July 15, 2013, Employer filed a termination petition, asserting that Claimant had fully recovered from his work-related injury as of June 13, 2013.

Before the WCJ, Claimant testified that on February 14, 2011, he was involved in a forklift accident while working for Employer. (Reproduced Record (R.R.) at 79a.) Claimant explained that he was driving a forklift down an aisle, when the forklift slid on some type of liquid on the floor, causing the forklift to slide into a handrail. (*Id.* at 79a-80a.) As a result of the accident, Claimant sustained a crushing injury to his left ankle and right calf. (*Id.* at 80a-83a.) Claimant was transported by ambulance to the Lehigh Valley Hospital emergency room, where he was treated for swollen and bruised legs. (*Id.* at 84a-85a.) Claimant was admitted to the hospital for observation for two days and then released. (*Id.* at 84a.) Claimant was out of work for approximately two months and returned to work part-time in the middle of April 2011, working four hours per day. (*Id.* at 111a-12a.) Sometime thereafter, Claimant returned to full-time work and continued to work full-time until March 2013. (*Id.* at 111a-12a.)

In January 2013, Claimant was treating with Dr. Ruht for his work-related injury. (*Id.* at 86a.) During the course of his treatment, Dr. Ruht ordered Claimant to undergo physical therapy for approximately five-to-six months, provided Claimant with a brace for his left ankle, and prescribed Neurontin, an anti-inflammatory, and a cream. (*Id.* at 86a-88a.) Dr. Ruht also referred Claimant to Dr. Sorrento. (*Id.* at 91a.) Dr. Sorrento sent Claimant for a bone scan and nerve testing and referred Claimant to Dr. Corba. (*Id.*) Claimant waited for approximately one month to see Dr. Corba. (*Id.*) During that time, in April 2013, Claimant began treating with Dr. Shingles. (*Id.* at 88a, 92a.) Dr. Shingles sent Claimant to physical therapy and referred Claimant to Dr. Corba. (*Id.* at 88a-89a.) Claimant eventually treated with Dr. Corba. (*Id.* at 92a.) Claimant, however, indicated that there was nothing that Dr. Corba could do for

him, so Dr. Corba referred Claimant to Dr. Palumbo. (*Id.* at 89a, 92a.) Dr. Palumbo recommended that Claimant undergo compartment pressure testing, but the insurance company would not pay for it so it was not scheduled. (*Id.* at 49a, 92a-93a.)

Claimant testified further that he continues to treat with Dr. Shingles once a month. (*Id.* at 49a.) Dr. Shingles prescribes Neurontin and Vicodin and has not sent Claimant for any additional testing. (*Id.* at 71a, 89a-90a.) Claimant's pain, which he described as burning and aching, remains the same as it was on the date of his work-related injury. (*Id.* at 90a.) The pain is the worst in the morning, and it keeps Claimant up at night. (*Id.* at 109a-10a.) Claimant sometimes experiences numbness in his right calf down to his right foot and in his left ankle down to his left foot. (*Id.* at 90a-91a.) Claimant also experiences an aching, throbbing pain in both legs, worse in the left leg and left ankle, when he stands or walks for a period of time and numbness in his right foot when he sits for a period of time. (*Id.* at 100a-02a.) Claimant reported minimal to no difference in his pain with or without the use of his left ankle brace. (*Id.* at 101a.) Claimant also explained that he has difficulty traversing stairs; he walks up the stairs one at a time to go to bed and then comes down the stairs in the morning and stays downstairs until bedtime. (*Id.* at 103a-04a.) The WCJ personally observed and compared Claimant's legs and noted that there did not appear to be a difference in hair growth or coloring, but that Claimant's left ankle appeared slightly smaller than his right ankle. (*Id.* at 98a.) The WCJ also observed Claimant ambulate fairly freely in the courtroom, but noted that Claimant's left leg appeared to be straighter and slightly more rigid than his right leg. (*Id.* at 56a-57a.)

3

On cross-examination, Claimant testified that he treated with Lehigh Valley Treatment Center for his work-related injury until September 23, 2011, when he was discharged from its care. (*Id.* at 49a-50a.) Claimant did not seek any additional treatment until June 2012. (*Id.* at 50a.) During this lapse in treatment, Claimant did not sustain any additional trauma; Claimant explained that he sought treatment because his legs started to hurt again. (*Id.* at 50a-51a.) Claimant testified further that he was referred to Dr. Shingles by his attorney, who is Dr. Shingles' brother. (*Id.* at 51a.) Dr. Shingles took Claimant out of work on March 14, 2013, and Claimant has not worked in any capacity since that time. (*Id.* at 51a-52a.) Prior to March 14, 2013, Claimant worked regular duty. (*Id.* at 51a-52a.) Claimant also testified on cross-examination that he is the primary caretaker for his two-year-old daughter because his girlfriend works nights. (*Id.* at 54a.) Claimant explained further that he tries to help his girlfriend around the house by washing dishes and doing laundry. (*Id.* at 53a.)

On re-direct examination, Claimant indicated that during his lapse in treatment, he continued to work, but he complained to Employer about the pain and asked Employer for assistance in obtaining treatment. (*Id.* at 60a-61a.) Claimant also indicated that at some point after he was released from the hospital, he returned to the emergency room because his feet and legs were frozen/cold to the touch. (*Id.* at 65a.) Claimant testified further that he has joint custody of his nine-year-old son, and when his son is with him every other week, he has to drive him back and forth to school. (*Id.* at 68a, 71a.) Claimant also has a fourteen-year-old daughter, whom he cares for during the summer when she is out of school. (*Id.* at 72a.)

4

Claimant presented the deposition testimony of Robert J. Corba, D.O., who is board certified in anesthesia and pain management. (*Id.* at 2a.) Dr. Corba testified that he first treated Claimant on March 18, 2013, on a referral from Dr. Sorrento, a podiatrist in Dr. Corba's practice. (*Id.* at 3a-4a.) On that date, Dr. Corba's physical examination of Claimant revealed severe tenderness over Claimant's left lateral lower leg, abnormal range of motion, left foot drop, an antalgic gait, and abnormal hair growth and discoloration in Claimant's left lower extremity. (*Id.* at 4a.) Dr. Corba indicated that Claimant was incapable of heel to toe ambulation, particularly on the left, and that his left lower extremity was abnormal to light touch. (*Id.*) Dr. Corba diagnosed Claimant with complex regional pain syndrome (CRPS) with reflex sympathetic dystrophy (RSD) of the left lower limb, pain in the limb, and contusion of the ankle. (*Id.* at 4a-5a, 13a, 20a, 22a.) Dr. Corba explained that a diagnosis of CRPS with RSD is made by physical examination, patient history, and physician evaluation; there are no diagnostic tests that would be inclusive or exclusive of diagnosing CRPS. (*Id.* at 7a, 10a.) Dr. Corba explained further that pain is a subjective constant with CRPS with RSD, but that the sympathetic tone evidenced by hyperpigmentation, swelling, hair and nail changes, and dysesthesias can wax and wane. (*Id.*)

Dr. Corba treated Claimant again on April 24, 2013. (*Id.* at 5a.) At that time, Dr. Corba prescribed a higher dosage of Neurontin, prescribed Elavil, a tricyclic anti-depressant, and advised Claimant to continue the use of his topical cream to numb the area. (*Id.*) Dr. Corba explained that Claimant was not interested in pursuing interventional therapy such as a sympathetic block; rather, Claimant desired a more conservative approach of increasing function and his medication. (*Id.*) Claimant returned to Dr. Corba on June 6, 2013. (*Id.* at 6a.) On

that date, Claimant's physical examination was similar to past physical examinations, and Dr. Corba advised Claimant to continue with his Neurontin, topical cream, anti-inflammatory, and Elavil. (*Id.*) Dr. Corba also recommended that Claimant undergo aquatherapy and prescribed Ultram for pain as needed. (*Id.*) Dr. Corba last treated Claimant in August 2013. (*Id.*) At that time, Dr. Corba did not believe that there was anything else he could offer Claimant other than continuing medication management. (*Id.* at 6a-7a.) When Claimant asked Dr. Corba whether he was a surgical candidate, Dr. Corba referred Claimant to Dr. Palumbo because surgery is not Dr. Corba's area of expertise. (*Id.* at 6a-7a.) Ultimately, Dr. Corba opined that Claimant did not have the capability of returning to work as a forklift driver, but that he could return to some form of employment that enabled him to change position from standing to sitting. (*Id.* at 13a.)

On cross-examination, Dr. Corba indicated that he treated Claimant on only four occasions, the first time on March 18, 2013, more than two years after Claimant sustained his work-related injury, and the last time on August 1, 2013. (*Id.* at 14a.) Dr. Corba explained that he stopped treating Claimant because Claimant had transportation issues, it was easier for Claimant to treat with his primary care physician, and Claimant's primary care physician would prescribe Vicodin and Dr. Corba would not. (*Id.*) Dr. Corba testified further on cross-examination that an individual can sustain a crush injury and recover without developing CRPS. (*Id.* at 21a-22a.)

Employer presented the deposition testimony of Paul Horenstein, M.D., a board certified orthopedic surgeon. (*Id.* at 28a.) Dr. Horenstein performed an independent medical examination of Claimant on June 13, 2013. (*Id.* at 30a.) On that date, Dr. Horenstein performed a physical examination, which revealed no

6

objective findings consistent with a diagnosis of RSD. (*Id.* at 34a.) Dr. Horenstein also reviewed Claimant's medical records, which revealed: (1) Dr. Ruht noted no objective signs of CRPS as of April 8, 2013; (2) MRIs of Claimant's lower legs performed on June 8, 2012, and June 12, 2012, were normal; (3) x-rays of Claimant's left ankle performed on September 14, 2012, were normal; (4) x-rays of Claimant's tibia and fibula performed on June 8, 2012, and August 17, 2012, were normal; (5) an EMG performed on the nerves of Claimant's lower extremities on March 5, 2013, was normal; and (6) a bone scan performed on February 27, 2013, was normal and indicated no evidence of RSD. (*Id.* at 30a-31a, 33a.) In addition, Dr. Horenstein noted that the type of pain described by Claimant was not consistent with RSD, that RSD was not observed by Dr. Ruht, Dr. Sorrento, Dr. Palumbo, or the hospital, and that RSD was not revealed by any diagnostic testing. (*Id.*) Dr. Horenstein noted further that compartment testing was not warranted because a diagnosis of compartment syndrome was not consistent with Claimant's history or physical examination. (*Id.* at 33a-34a, 38a-39a.) Ultimately, Dr. Horenstein concluded that Claimant had fully recovered from his bilateral lower extremity crush injuries and could return to work full duty as a forklift operator without any restrictions. (*Id.* at 33a-34a.)

Employer and Claimant also jointly presented the deposition testimony of Daniel J. Magaskie, a field investigator with F&M Investigations, who conducted surveillance of Claimant on April 1, 2013, April 3, 2013, and April 16, 2013. (*Id.* at 114a-17a.) During the surveillance, Mr. Magaskie observed Claimant: (1) walk without a limp; (2) walk without the use of a cane or other orthopedic or assistive device; (3) drive a vehicle freely to various destinations, without any difficulty accelerating, turning, stopping, or performing any other

driving tasks; and (4) walk without his ankle brace on one occasion.[1] (*Id.* at 115a-17a, 122a.) Mr. Magaskie indicated that he did not see Claimant favor either leg or give any indication that he was in pain. (*Id.* at 117a.) Mr. Magaskie explained that his notes were summarized in a report prepared by his supervisor, and the report is consistent with his notes and his observations on April 1, 2013, April 3, 2013, and April 16, 2013. (*Id.* at 117a-19a.) Mr. Magaskie testified further that his total surveillance lasted approximately twelve and one-half hours and that during that time, he observed Claimant outside of his home and outside of his vehicle for a total of six minutes. (*Id.* at 121a.)

On September 16, 2014, the WCJ issued a decision granting Employer's termination petition. In so doing, the WCJ summarized the witnesses' testimony and made the following credibility determinations:

> 8. This Judge has carefully and thoroughly reviewed the testimony of Claimant as well as the opinions of the medical providers and surveillance evidence in this matter. Also carefully and thoroughly reviewed was the documentary evidence.
>
> 9. Claimant's testimony is rejected as less than credible and is unpersuasive. This finding is based upon this Judge's personal observation of Claimant's actions and demeanor during his testimony. In addition, Claimant's testimony is rejected as not credible for the following reasons:

---

[1] When questioned about Claimant's use of a brace, Mr. Magaskie explained that it never appeared to him that Claimant was wearing a brace. (R.R. at 122a.) More specifically, Mr. Magaskie explained that on April 3, 2013, Claimant's ankles were visible because Claimant was not wearing long pants, and he observed that Claimant was not wearing a brace. (*Id.*) In addition, Mr. Magaskie indicated that on April 1, 2013, and April 16, 2013, he never saw a brace, but Claimant was wearing long pants and, therefore, it was possible that Claimant was wearing one underneath his long pants. (*Id.*)

8

a. Claimant's testimony that his pain level has remained the same since the date of injury is simply not believable, especially considering the fact that Claimant was able to return to work from April of 2011 until March 2013−almost 2 years;

b. Claimant's testimony that he is primary caregiver for his youngest daughter, half time caregiver for his son and summertime caregiver to his teenage daughter is inconsistent with someone with the pain levels Claimant claims;

c. Claimant's rejection of the treatment options provided by Dr. Corba as well as Dr. Corba's testimony that Claimant preferred an increase in narcotic medication to other treatments is troubling.

10. This Judge has carefully and thoroughly reviewed the testimony of Robert J. Corba, D.O. and Paul Horenstein, M.D. and finds the testimony of Dr. Horenstien [sic] competent and credible and accepts that testimony over the opinions of Dr. Corba where those opinions differ. Dr. Horenstien's [sic] testimony is consistent with the diagnostic studies in this case. In addition, Dr. Horenstien's [sic] opinions are more consistent with Claimant's work history and treatment history. Further, Claimant's testimony has been deemed not credible and, according to Dr. Corba's testimony, diagnosis of CRPS/RSD is made, at least in part, by patient history therefore, the credibility of Dr. Corba's diagnosis can rise no higher than the credibility of Claimant.

11. The testimony of Daniel J. Magaskie is deemed credible but irrelevant to the issues before this Judge. Mr. Magaskie is deemed credible because his testimony was consistent with the images on the video surveillance.

(WCJ's Decision at 7-8.) Based on these credibility determinations, the WCJ concluded that Employer had met its burden of proving that Claimant had fully recovered from his work-related injury as of June 13, 2013.

9

Claimant appealed to the Board, which affirmed the WCJ's decision. Claimant then petitioned this Court for review. On appeal,[2] Claimant argues that: (1) the WCJ failed to issue a reasoned decision because the WCJ's findings of fact are not supported by substantial evidence; (2) the WCJ capriciously disregarded material, competent evidence of record; (3) the WCJ erred in finding the video surveillance evidence irrelevant; and (4) the WCJ committed an error of law when she refused to admit Claimant's medical records into evidence.

First, we address Claimant's argument that the WCJ failed to issue a reasoned decision because the WCJ's findings of fact are not supported by substantial evidence. More specifically, Claimant argues that Dr. Corba's testimony should be found more credible than Dr. Horenstein's testimony because Dr. Corba is more qualified in the areas of CRPS and RSD than Dr. Horenstein and Dr. Horenstein had less interaction with Claimant than Dr. Corba. It appears that Claimant also argues that the reasons relied upon by the WCJ in finding Dr. Horenstein's testimony more credible than Dr. Corba's testimony−i.e., Dr. Horenstein's testimony is consistent with the diagnostic studies and Dr. Horenstein's opinions are more consistent with Claimant's work and treatment history−are not supported by the record because the record contains evidence to rebut these statements. Employer, on the other hand, argues that Claimant is essentially attempting to re-litigate the facts of this case and is asking this Court to overturn the WCJ's credibility determinations.

---

[2] This Court's standard of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704.

10

Section 422(a) of the Workers' Compensation Act (Act)[3] requires a WCJ to issue a reasoned decision such that it that permits an appellate court to exercise adequate appellate review. *Amandeo v. Workers' Comp. Appeal Bd. (Conagra Foods)*, 37 A.3d 72, 76 (Pa. Cmwlth. 2012). To satisfy this standard, a WCJ need not discuss every detail in the record. *Id.* "Rather, Section 422(a) of the Act requires WCJs to issue reasoned decisions so that this Court does not have to 'imagine' the reasons why a WCJ finds that the conflicting testimony of one witness was more credible than the testimony of another witness." *Id.* (quoting *Dorsey v. Workers' Comp. Appeal Bd. (Crossing Constr. Co.)*, 893 A.2d 191, 196 (Pa. Cmwlth. 2006), *appeal denied*, 916 A.2d 635 (Pa. 2007)). "The WCJ is free to accept or reject, in whole or in part, the testimony of any witness, including medical witnesses." *Leca v. Workers' Comp. Appeal Bd. (Phila. Sch. Dist.)*, 39 A.3d 631, 634 n.2 (Pa. Cmwlth. 2012). "[W]here a WCJ summarizes testimony and also objectively explains [her] credibility determinations, the decision will satisfy the [reasoned decision] requirement." *Amandeo*, 37 A.3d at 76.

Further, we note that in workers' compensation proceedings, the WCJ is the ultimate finder of fact. *Williams v. Workers' Comp. Appeal Bd.* (*USX Corp.-Fairless Works*), 862 A.2d 137, 143 (Pa. Cmwlth. 2004). As fact-finder, matters of credibility, conflicting medical evidence, and evidentiary weight are within the WCJ's exclusive province. *Id.* If the WCJ's findings are supported by substantial evidence, they are binding on appeal. *Agresta v. Workers' Comp. Appeal Bd.* (*Borough of Mechanicsburg*), 850 A.2d 890, 893 (Pa. Cmwlth. 2004). It is irrelevant whether there is evidence to support contrary findings; the relevant

---

[3] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 834.

11

inquiry is whether substantial evidence supports the WCJ's necessary findings. *Hoffmaster v. Workers' Comp. Appeal Bd.* (*Senco Prods., Inc.*), 721 A.2d 1152, 1155 (Pa. Cmwlth. 1998).

To succeed in a termination petition, the employer bears the burden to prove that the claimant's disability has ceased and/or that any current disability is unrelated to the claimant's work injury. *Jones v. Workers' Comp. Appeal Bd. (J.C. Penney Co.)*, 747 A.2d 430, 432 (Pa. Cmwlth.), *appeal denied*, 764 A.2d 1074 (Pa. 2000). An employer may satisfy this burden by presenting unequivocal and competent medical evidence of the claimant's full recovery from his work-related injuries. *Koszowski v. Workmen's Comp. Appeal Bd. (Greyhound Lines, Inc.)*, 595 A.2d 697, 699 (Pa. Cmwlth. 1991). Furthermore, in order to terminate benefits, an employer must prove that all of a claimant's work-related injuries have ceased. *Central Park Lodge v. Workers' Comp. Appeal Bd. (Robinson)*, 718 A.2d 368, 370 (Pa. Cmwlth. 1998).

Here, Claimant seems to suggest that the WCJ's decision is not reasoned or supported by substantial evidence because the testimony of Dr. Corba supports a finding that Claimant suffers from CRPS with RSD and has not fully recovered from his work-related injury, and the WCJ should have accepted Dr. Corba's testimony as more credible than Dr. Horenstein's testimony. Claimant's arguments, however, demonstrate Claimant's lack of understanding regarding the requirements for a reasoned decision and what constitutes substantial evidence to support the WCJ's findings. While Dr. Corba opined that Claimant suffers from CRPS with RSD and is not capable of returning to work as a forklift operator, Dr. Horenstein opined that Claimant's physical examination and pain complaints were not consistent with CRPS with RSD and that Claimant had fully

12

recovered from his work-related injury as of June 13, 2013. The WCJ credited Dr. Horenstein's testimony over Dr. Corba's testimony on the basis that Dr. Horenstein's testimony is consistent with Claimant's diagnostic studies and more consistent with Claimant's work and treatment history. (WCJ's Decision at 7.) Moreover, the WCJ found Dr. Corba's diagnosis could rise no higher than the credibility of Claimant because, according to Dr. Corba, a diagnosis of CRPS with RSD is made, at least in part, by patient history. (WCJ's Decision at 8.) In addition, the WCJ rejected Claimant's testimony as less than credible and unpersuasive based on her personal observation of Claimant's actions and demeanor[4] and other factors, such as that Claimant's testimony that he was the primary caregiver for his two-year-old daughter, half-time caregiver for his son, and summertime caregiver for his daughter was inconsistent with someone with the pain levels alleged by Claimant. (WCJ's Decision at 7.)

The WCJ's findings and credibility determinations constitute a reasoned decision because the WCJ articulates a rationale for finding Dr. Horenstein more credible than Dr. Corba and for discrediting Claimant's testimony. We stress that it does not matter if there is evidence in the record that could support a finding contrary to that made by the WCJ; the only inquiry is whether there is substantial evidence of record to support the WCJ's findings. *Hoffmaster*, 721 A.2d at 1155. The WCJ, as the ultimate fact-finder, had the discretion to credit Dr. Horenstein's testimony over Dr. Corba's testimony regarding whether Claimant suffers from CRPS with RSD and whether Claimant is

---

[4] We note that "a WCJ's observation of a witness's demeanor alone is sufficient to satisfy the reasoned decision requirement." *Amandeo*, 37 A.3d at 77.

13

fully recovered from his February 14, 2011 work-related injury. Furthermore, this finding is supported by substantial evidence because Dr. Horenstein opined that Claimant's physical examination and pain complaints were not consistent with CRPS with RSD and that Claimant had fully recovered from his work-related injury as of June 13, 2013. As a result, the Board properly concluded that the WCJ's decision granting Employer's termination petition was reasoned and supported by substantial evidence.

Next, we address Claimant's argument that the WCJ capriciously disregarded material, competent evidence of record. More specifically, Claimant argues that the WCJ ignored: (1) the paper entitled "Reflex Sympathetic Dystrophy and Complex Regional Pain Syndrome" published by the International Research Foundation for RSD/CRPS; (2) Dr. Horenstein's failure to address Claimant's left ankle brace; and (3) the video surveillance evidence. We previously have held that a capricious disregard only occurs when the WCJ deliberately ignores relevant, competent evidence. *Capasso v. Workers' Comp. Appeal Bd. (RACS Assocs., Inc.)*, 851 A.2d 997, 1002 (Pa. Cmwlth. 2004). Capricious disregard of evidence "is a deliberate and baseless disregard of apparently trustworthy evidence." *Williams*, 862 A.2d at 144. "[W]here there is substantial evidence to support an agency's factual findings, and those findings in turn support the conclusions, it should remain a *rare* instance in which an appellate court would disturb an adjudication based upon capricious disregard." *Leon E. Wintermyer, Inc. v. Workers' Comp. Appeal Bd. (Marlowe)*, 812 A.2d 478, 487 n.14 (Pa. 2002) (emphasis added).

First, Claimant has presented no evidence that the paper entitled "Reflex Sympathetic Dystrophy and Complex Regional Pain Syndrome" published

14

by the International Research Foundation for RSD/CRPS was admitted into evidence and, therefore, the WCJ could not have capriciously disregarded it. Based upon our review of the record, the paper referenced by Claimant was not introduced as an exhibit at a hearing before the WCJ or attached as an exhibit to Dr. Corba's deposition. Rather, the paper was merely discussed with Dr. Corba at the time of his deposition. (R.R. at 11a-13a.) In addition, we note that the paper itself does not provide any evidence relative to whether Claimant suffers from CRPS with RSD or whether Claimant has fully recovered from his work-related injury. Second, with respect to the video surveillance evidence, the WCJ did not deliberately ignore or baselessly disregard relevant evidence. The WCJ took the video surveillance evidence into consideration when she admitted it into the record, but decided to give it little to no weight in reaching her decision. Lastly, Claimant's argument that the WCJ capriciously disregarded that Dr. Horenstein failed to address Claimant's left ankle brace essentially attacks the WCJ's credibility determinations. This Court will not overturn the WCJ's credibility determinations or reweigh the evidence for the reasons set forth above. As a result, we cannot conclude that the WCJ capriciously disregarded evidence.

Next, we address Claimant's argument that the WCJ erred in finding the video surveillance evidence irrelevant. More specifically, Claimant argues that "the video surveillance is relevant because it substantiates . . . Claimant's testimony that he leads an enforced sedentary life." (Claimant's Br. at 24.) While the WCJ used the word "irrelevant" to describe her conclusion not to rely on Mr. Magaskie's testimony in reaching her decision, we believe that the WCJ intended to indicate that she afforded the testimony little or no weight. The WCJ determined that the video surveillance evidence was relevant when she admitted

15

Mr. Magaskie's deposition testimony into the record and addressed such testimony in her decision. By relying solely on the medical evidence and not considering the video surveillance evidence in rendering her decision, the WCJ actually determined that she would give the video surveillance little to no weight. "[T]he WCJ is the sole arbiter of the credibility and the weight of testimony and other evidence, and he or she is free to reject or accept the testimony of any witness in whole or in part." *O'Donnell v. Workers' Comp. Appeal Bd. (United Parcel Serv.)*, 831 A.2d 784, 789 (Pa. Cmwlth. 2003). By arguing that the WCJ erred in giving the video surveillance evidence little to no weight in her decision, Claimant is essentially asking this Court to reweigh the evidence, which we will not do for the reasons set forth above. Therefore, we cannot conclude that the WCJ erred in giving the video surveillance evidence little to no weight in her decision.

Finally, we address Claimant's argument that the WCJ committed an error of law when she refused to admit Claimant's medical records into evidence. The admission of evidence in workers' compensation proceedings lies within the sound discretion of the WCJ. *Atkins v. Workers' Comp. Appeal Bd. (Stapley in Germantown)*, 735 A.2d 196, 199 (Pa. Cmwlth. 1999). The WCJ's determination to exclude evidence will not be overturned unless there was an abuse of discretion. *Id.* Here, we find no abuse of discretion. Claimant's medical records were reviewed and explained by both Dr. Corba and Dr. Horenstein in their depositions. In addition, the deposition testimony of Dr. Corba and Dr. Horenstein provided the WCJ with the medical evidence necessary to issue a decision on Employer's termination petition. Accordingly, we cannot conclude that the WCJ committed an error of law in refusing to admit Claimant's medical records into evidence.

16

For the above stated reasons, we affirm the Board's decision.

_____
P. KEVIN BROBSON, Judge

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

Ricardo Cruz,              :
           Petitioner     :
                           :
          v.               :    No. 1966 C.D. 2015
                           :
Workers' Compensation Appeal   :
Board (A.J. Bazzini Co., Inc.),    :
          Respondent   :

# **O R D E R**

AND NOW, this 22nd day of August, 2016, the order of the Workers'
Compensation Appeal Board is hereby AFFIRMED.

 

 

                                    _____
                                    P. KEVIN BROBSON, Judge